UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
                                                        :
        IN RE:                                          :
                                                        :          ORDER AND OPINION
        ARCAPITA BANK B.S.C.(C),                        :          AFFIRMING JUDGMENTS OF
                                                        :          BANKRUPTCY COURT
                                        Debtor,         :
                                                        :          21 Civ. 8296 (AKH)
                                                        :
                                                        :
                                                        :
                                                        :
                                                        :
------------------------------------------------------- X
                                                        :
        BAHRAIN ISLAMIC BANK,                           :
                                                        :
                                        BisB,           :
                                                        :
                -against-                               :
                                                        :
        ARCAPITA BANK B.S.C.(C),                        :
                                                        :
                                        Appellee.       :
                                                        :
------------------------------------------------------- X
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

         This appeal arises out of the Chapter 11 proceedings for Appellee-Debtor

Arcapita Bank B.S.C.(C) ("Arcapita"). Prior to its bankruptcy filing, Arcapita was licensed as an

Islamic wholesale bank by the Central Bank of Bahrain and operated as an investment bank and

global manager of Shari'a compliant investments. Arcapita maintained a pre-Petition business

relationship with BisB Bahrain Islamic Bank[1] ("BisB"), through which Arcapita and BisB made

---

[1] This appeal was initially consolidated with that brought by another bank, Tadhamon Capital B.S.C.(c), *see* 21-
cv-8325, based on the substantially similar legal and factual issues presented, and because the Bankruptcy Court
heard the arguments and denied them in consolidated orders. After the opening brief was filed, however, the

several Shari'a-compliant short-term investments with each another.  Upon its bankruptcy filing, Arcapita attempted to recover the proceeds of certain investments made just days before the Petition Date.  However, Bisb refused to turn over the proceeds, asserting that it exercised a purported right to a setoff under Bahraini law, reconciling the debts owing between them. Thereafter, Appellee Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c) (the "Committee") instituted adversary proceedings against Bisb, asserting claims for breach of contract and violation of the automatic stay, and seeking turnover of the investment proceeds and claims disallowance.

BisB mightily fought to avoid litigating before the Bankruptcy Court.  It first moved to dismiss based on lack of personal jurisdiction.  The motion was granted by the Bankruptcy Court but reversed on appeal to the District Court.  BisB next moved to dismiss on grounds of international comity.  The Bankruptcy Court denied that motion and BisB's subsequent request for reconsideration.  Finally, the parties cross-moved for summary judgment. The Bankruptcy Court granted the Committee's motion and denied BisB's motion, entered judgment in favor of the Committee, and awarded prejudgment interest at New York's statutory rate of 9 percent.

BisB now appeals from five orders[2] of the Bankruptcy Court of the Southern District of New York.  *See* Appellant's Brief ("A.B."), ECF No. 12-1.  It identifies fourteen

_____

Committee reached a settlement with Tadhamon and dismissed its appeal.  *See* 21-cv-8325, ECF No. 15. Accordingly, this opinion addresses only the arguments raised by BisB.

[2]   BisB appeals an order entered on October 13, 2017, denying BisB's motion to dismiss on the basis of comity and extraterritoriality, *see* 575 B.R. 229 (Bankr. S.D.N.Y. 2017) ("Comity Order"); an order entered on February 5, 2018, denying BisB's motion for reconsideration of the October 13, 2017 decision, *see* 2018 Bankr. LEXIS 295 (Bankr. S.D.N.Y. Feb. 5, 2018) ("Reconsideration Denial"); the Bankruptcy Court's decision dated April 23, 2021, granting Appellee's motion for summary judgment and denying BisB's cross-motion for summary judgment, *see* 628 B.R. 414 (Bankr. S.D.N.Y. 2021) ("SJ Order"); the Bankruptcy Court's decision dated September 22, 2021, setting the prejudgment interest rate, *see* 633 B.R. 207 (Bankr. S.D.N.Y. 2021)

issues for resolution, which can be summarized briefly as follows.  BisB challenges the

Bankruptcy Court's refusal to revisit the issue of personal jurisdiction, raised again in BisB's

motion for summary judgment and after the remand from the District Court; the Bankruptcy

Court's failure to dismiss on international comity grounds; the Bankruptcy Court's ruling that

BisB was not entitled to setoff, as a matter of Bahraini law or under the safe harbor provisions of

the Bankruptcy Code and, therefore, was in violation of the automatic stay; and, the Bankruptcy

Court's award of prejudgment interest and use of the New York statutory rate.  For the reasons

discussed below, I find BisB's arguments without merit, affirm the challenged orders of the

Bankruptcy Court, and dismiss the appeal.

## BACKGROUND[3]

Prior to its bankruptcy filing on March 19, 2012, Arcapita was an Islamic

wholesale bank licensed by the Central Bank of Bahrain ("CBB") and headquartered in Bahrain.

It operated as an investment bank and global manager of Shari'a-compliant investments.  BisB is

an Islamic commercial bank licensed and headquartered in Bahrain, but which also maintains

and uses correspondent banks in New York.  The CBB is the sole regulator of Bahrain's

financial sector and is in charging of licensing, regulation, and supervision of parties carrying out

regulated financial services in Bahrain.

Arcapita maintained a pre-Petition business relationship with BisB, through which

Arcapita and BisB made Shari'a-compliant investments with each other.  Islamic banking and

---

("Interest Rate Order"); and one order dated September 23, 2021, entering judgment in favor of Appellee, *see*
633 B.R. 215 (Bankr. S.D.N.Y. 2021) ("Final Judgment").

[3]   The following facts are not disputed, and unless otherwise noted, are drawn from the background section of the
Bankruptcy Court's order granting the Committee's motion, and denying BisB's motion, for summary
judgment.  *See Off'l Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re
Arcapita B.S.C.(c))*, 628 B.R. 414 (Bankr. S.D.N.Y. 2021).

finance is a revival of faith-based rules governing how commercial and financial transactions are executed. One of the religiously mandated rules is a prohibition of interest; thus, a Shari'a-compliant investment cannot technically return interest. This prohibition impacts the manner in which Islamic banks and investments funds manage liquidity, comply with applicable foreign and domestic regulations, and operate in the financial markets. It also means that such entities do not borrow or lend in the traditional sense, instead employing Shari'a-compliant investments.

One such Shari'a-compliant investment employed by the parties is the commodity *murabaha* investment. The commodity *murabaha* is a tool for short-term liquidity management. It works as follows. A placing party transfers funds to a receiving party (a party in need of funds). The receiving party, acting as an agent for the placing party, purchases specified commodities on the placing party's behalf. The receiving party immediately agrees to repurchase those commodities from the placing party on a cost-plus basis to be paid on an agreed future date. The transactions are documented by form offers, acceptances, and confirmations exchanged by the parties over the course of a day. As utilized by Arcapita and BisB, the placements were organized so that the placing party would retain title to the commodities for seconds or minutes in order to remove the risk of commodity volatility.[4] The commodity *murabaha* is Shari'a-compliant because it does not technically provide for interest but nevertheless creates a transparent analogy to principal (the cost price) and interest (the fixed profit added to the cost price), from which one can infer an interest rate and credit margin. The

---

[4] The receiving party has no obligation to retain title to the underlying commodities and ordinarily sells them to a buyer other than the original seller. This allows the receiving party immediate access to the necessary funds. Put another way, the placing party makes a loan to the receiving party, using commodities as a vehicle to transfer the funds. The loan becomes payable on an agreed deferred date and with an agreed profit margin.

interest rate is not tied to market.  The *murabaha* creates an obligation to repurchase by the receiving party, and the placing party expects to receive the agreed-upon repurchase price.

### BisB's Placements with Arcapita

Starting in April 2002, BisB entered into a Master Placement Agreement (the "BisB Placement Agreement"), pursuant to which BisB would make *murabaha* placements with Arcapita ("BisB Placements").  In July 2003, Arcapita entered into an agreement with BisB, (the "Arcapita Master Agreement"), whose terms mirrored those in the BisB Placement Agreement and under which Arcapita would make placements with BisB ("Arcapita Placements").

The debts owed by Arcapita to BisB, and that form the basis for BisB's purported right to setoff, originated from two investments (BisB Placements) made on December 1, 2011 under the BisB Placement Agreement.  In those related transactions, BisB deposited approximately $9.8 million with Arcapita with the expectation that it would be returned in just over a month.  Those deposits were rolled over continually by agreement, and were set to expire on March 15 and 16, 2012, leaving Arcapita indebted to BisB for approximately $9.8 million.

### Arcapita's Placements with BisB

In addition to investments by BisB with Arcapita, Arcapita made investments with BisB (Arcapita Placements).  Although Arcapita filed for Chapter 11 protection on March 19, 2012, it executed three placements, discussed in greater detail below, with BisB on March 13, 14, and 15, 2012, each in the amount of $10 million, with respective maturity dates of March 27, 29, and 26, 2012.  Arcapita proposed making these placements in U.S. Dollars, which BisB accepted and directed that Arcapita send the funds to BisB's correspondent bank accounts in New York.

Although BisB now claims it was unaware of the imminent bankruptcy filing, Arcapita's financial difficulties were known throughout the Bahraini banking community. BisB's internal memoranda confirm that BisB was generally aware of Arcapita's financial difficulties.  For example, Arcapita proposed a placement on January 10, 2012, but BisB's then Senior Manager forwarded the proposal to other BisB employees with an accompanying message that recommended: "Outright decline is my response based on execution issues, risky exit avenue, and the general situation with Arcapita."  Another employee responded that Arcapita was "just trying their luck.  It seems that the fund company is desperate."  Additionally, on March 12, 2012, an Arcapita representative called BisB claiming it needed more money from BisB.  BisB refused, stating that Arcapita was "unable to repay [its] loans, so how we can increase it to you!"  BisB refused to renew any investments, stating, "No.  You have to pay," and noted that Arcapita was no longer "bringing good business of large deals."

On March 13, 2012, just before the two BisB Placements were set to expire on March 15 and 16, Arcapita asked BisB to roll over the investments again.  BisB was reluctant, citing the absence of good deals.  An Arcapita representative promised that Arcapita would "conclude with [BisB] a good deal within this week[] [that] might be over 5 million."  BisB stated that it was looking for a good deal, something that exceeded $10 million.  That same day, Arcapita made a $10 million placement with BisB, set to mature on March 27, 2012.  On March 14, 2012, BisB also agreed to rollover the BisB Placements set to expire on March 15 and 16, 2012, but only for a week.  In addition, Arcapita made another $10 million placement on March 14, 2012, set to mature on March 25, 2012.  Finally, on March 15, 2012, Arcapita made a third $10 million placement set to mature on March 26, 2012.  Thus, just prior to Arcapita's filing for

Chapter 11, it had a total of $30 million in placements with BisB, and was likewise indebted to BisB for approximately $9.8 million.

Arcapita filed for Chapter 11 protection on March 19, 2012, causing an automatic stay on its estate imposed under Section 362 of the Bankruptcy Code. Also on March 19, 2012, Arcapita called BisB and explained the consequences of the automatic stay—that Arcapita could not withdraw any funds from the estate, and therefore, could not repay its loans. However, Arcapita also pointed out that the parties had mutual *murabaha* deals, and that BisB's balance with Arcapita was nearly $10 million. Arcapita suggested that Arcapita withdraw $20 million and keep the remaining balance of $10 million "just for comfort" with BisB, noting that it was more than enough to cover the $9.8 million obligation.

And the parties did just that. When the March 13 and 15, 2012 placements matured on March 27 and 26, respectively, BisB paid Arcapita the proceeds of $20 million, but when the March 14 placement matured on March 27, 2012, BisB did not pay the proceeds. Arcapita's bankruptcy counsel subsequently made demands for BisB to turn over the remaining $10 million in proceeds, but BisB refused. Instead, on June 28, 2012, counsel for BisB sent a letter to Arcapita's counsel, asserting that BisB had exercised a right of setoff under Bahraini law of the debts owing between itself and Arcapita.

On July 4, 2012, the CBB issued a Formal Direction—a type of special law that supersedes the general law provisions in the Bahraini Civil Code—in which the CBB instructed BisB either to comply with the requests to release the funds and return the funds immediately to Arcapita, or to seek permission from the U.S. Bankruptcy Court prior to effecting any setoff, and if such permission was not granted, that BisB return the funds that it held for Arcapita. BisB

responded to the Formal Direction and requested that the CBB reconsider and withdraw its Formal Direction.  The CBB did neither, but BisB did not turn over the funds.

On August 26, 2013, the Committee commenced adversary proceedings against BisB in the Bankruptcy Court for the Southern District of New York (Sean Lane, U.S.B.J., presiding), asserting claims for breach of contract under Bahraini law, violation of the automatic stay under Section 362(a) of the Bankruptcy Code, and seeking turnover under Section 542(b) of the Bankruptcy Code and claims disallowance.  BisB immediately moved to dismiss, citing lack of personal jurisdiction, that the claims were barred by the presumption against extraterritoriality, and that the claims were barred by principles of international comity.  On April 17, 2015, the Bankruptcy Court granted BisB's motion, finding that BisB's use of correspondent banks was an insufficient basis upon which to establish personal jurisdiction.  *See* 529 B.R. 57 (Bankr. S.D.N.Y. Apr. 17, 2015).  The Committee appealed to the District Court.  Judge George Daniels reversed and remanded, finding that BisB chose to have the placements in U.S. Dollars and chose to receive Arcapita's funds through BisB's New York correspondent banks, creating the necessary purposeful availment and supporting the Bankruptcy Court's exercise of personal jurisdiction.  *See* 549 B.R. 56 (S.D.N.Y. 2016).

On remand, BisB renewed its motion to dismiss based on international comity. The Bankruptcy Court denied the motion as well as BisB's subsequent motion for reconsideration.  *See* 575 B.R. 229 (Bankr. S.D.N.Y. 2017); 2018 Bankr. LEXIS 295 (Bankr. S.D.N.Y. Feb. 5, 2018).  The parties proceeded to discovery and ultimately cross-moved for summary judgment.  In its cross-motion, BisB renewed its challenge to personal jurisdiction, arguing that new evidence unearthed in discovery revealed that Arcapita chose to make placements in U.S. Dollars, upending the premise of Judge Daniels's ruling.  It also argued that it

was entitled to setoff under applicable Bahraini law, and that the CBB Formal Direction could not apply retroactively to invalidate the already-exercised right.  In addition, BisB argued that the *murabaha* transactions were protected under the so-called safe harbor provisions of the Bankruptcy Code, either as securities contracts, forward contracts, swap agreements, or contractual rights under the law merchant or by reason of normal business practice.  The Bankruptcy Court rejected BisB's arguments, denied its motion for summary judgment, and granted the Committee's motion as to its claims for breach of contract under Bahraini law, turnover under Section 542(b) of the Bankruptcy Code, and violation of the automatic stay under Section 362(a) of the Bankruptcy Code (but denied damages as to the stay violation).  *See generally* 628 B.R. 414 (Bankr. S.D.N.Y. 2021); *id.* at 476–81.  The Bankruptcy Court also granted the Committee's request for prejudgment interest, notwithstanding BisB's objection based on the prohibition of interest under Bahraini law, awarded interest at the New York statutory rate of 9 percent, over BisB's objection that interest should be set at the federal rate under 28 U.S.C. § 1961(a), which BisB calculated to be 0.738%, *see* 633 B.R. 207 (Bankr. S.D.N.Y. 2021), and entered judgment for the Committee, *see* 633 B.R. 215 (Bankr. S.D.N.Y 2021).  This appeal followed.

BisB identifies 14 issues for appeal, which can be summarized as follows: (i) the Bankruptcy Court's refusal to revisit the issue of personal jurisdiction; (ii) the denial of BisB's motion to dismiss based on principles of international comity, and its subsequent motion for reconsideration; (iii) the Bankruptcy Court's finding that BisB did not have a valid right of setoff under Bahraini law; (iv) the Bankruptcy Court's finding that none of the safe harbor provisions applied; (v) the Bankruptcy Court's finding that the setoff was disallowed under Section 553(a)(3)(C) because BisB obtained debts for the purpose of exercising setoff; (vi) the

Bankruptcy Court's finding that BisB violated the automatic stay; and, (vii) the Bankruptcy Court's award of prejudgment interest at the New York statutory rate.

## DISCUSSION

I.   Legal Standard

District courts have jurisdiction over appeals of "final judgments, orders, and decrees" of the bankruptcy courts.  28 U.S.C. § 158(a)(1).  A bankruptcy court's conclusions of law, including grants of summary judgment, are reviewed *de novo*, *see In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2004), and a bankruptcy court's factual conclusions are examined for clear error. See Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.") *accord In re Cody, Inc.*, 338 F.3d at 94.  A finding of fact is clearly erroneous if the district court "when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Off'l Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett Funding Grp.)*, 212 B.R. 206, 211 (2d B.A.P. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998); *accord. In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  In addition, the extension or denial of comity is reviewed for abuse of discretion.  *See Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 474 B.R. 76, 81 (S.D.N.Y. 2012) (citing *Finanz AG Zurich v. Bianco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)).

II.   Analysis

A.   The Bankruptcy Court Did Not Err in Exercising Personal Jurisdiction Over BisB

BisB argues that the Bankruptcy Court erred in concluding that it could exercise

personal jurisdiction over BisB.  In its motion for summary judgment, notwithstanding the prior

appeal and ruling by Judge Daniels, BisB renewed its personal jurisdiction challenge, arguing

that new evidence unearthed in discovery showed that it was Arcapita who chose to use U.S.

Dollars to effectuate the investments, upending the premise of the district court's ruling that

BisB purposefully availed itself of New York by choosing to use U.S. Dollars.  BisB argued that

the Bankruptcy Court could reconsider the issue of personal jurisdiction (and the district court's

ruling) on a motion for summary judgment because of the new evidence, citing *Bank Leumi USA

v. Ehrlich*, 98 F. Supp. 3d 637 (S.D.N.Y. 2015), for the proposition that a court may reconsider a

prior ruling at summary judgment when new evidence comes to light after a ruling on a Rule

12(b) motion.

   Under the law of the case doctrine, a decision on an issue of law made at one

stage of a case becomes binding precedent to be followed in subsequent stages of the same

litigation.  *See In re PCH Assocs.*, 924 F.2d 585, 592 (2d Cir. 1991).  The mandate rule is a

subspecies of this rule and applies when an appellate court decides an issue and remands to a

lower court.  A "lower court 'must follow the mandate issued by an appellate court.'"  *See In re

Coudert Bros. LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (quoting *Puricelli v. Republic of Argentina*,

797 F.3d 213, 218 (2d Cir. 2015)).

   The Bankruptcy Court did not err in rejecting BisB's request for reconsideration.

BisB did not appeal from Judge Daniels's ruling, and as such, the ruling constituted the law of

the case.  *See United States v. Ben Zvi*, 242 F.3d 89, 96 (2d Cir. 2001) (quoting *County of Suffolk

v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) ("Under [the second rule of

the law of the case doctrine, a decision made at a previous stage of litigation, which could have

been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are

deemed to have waived the right to challenge that decision . . . ."). The Bankruptcy Court had no power to reject the express holding of the appellate court, and necessarily, could not have abused its discretion by declining to entertain BisB's renewed but previously litigated personal jurisdiction challenge.

The Bankruptcy Court also properly distinguished *Bank Leumi* as a case involving a district court's reconsideration of its own prior ruling rather than that of an appellate court. Were the Bankruptcy Court to have adopted BisB's argument, it effectively would have been adhering to its original ruling that it lacked personal jurisdiction over BisB.  However, the Bankruptcy Court would have committed error.  The discretionary rule permitting a court to reconsider its own prior rulings operates only in the absence of an intervening ruling on the issue by a higher court.  *See In re Coudert Bros. LLP*, 809 F.3d at 101 (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

Although BisB complains that the Bankruptcy Court erred in declining to entertain its personal jurisdiction challenge based on the new evidence, it also complains that the Bankruptcy Court erred in rejecting its new evidence as "more of the same."  Implicit in this argument is that the Bankruptcy Court found both that it was not free to re-decide the issue but also, even if it were, that BisB "had not shown that [its] new evidence compels a different conclusion."  628 B.R. at 433.  I find no error in the Bankruptcy Court's analysis as to the new evidence because the new evidence neither "upended the premise" of Judge Daniels's decision nor compelled a finding that the Bankruptcy Court lacked personal jurisdiction.

Judge Daniels ruled that the Bankruptcy Court could exercise personal jurisdiction based on BisB's use of New York correspondent accounts because BisB purposefully availed itself of carrying on activities in New York by using those accounts to

effectuate Arcapita's placements.  *See Off'l Comm. of Unsecured Creditors of Arcapita, Bank. B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 71 (S.D.N.Y. 2016).  Judge Daniels stated that BisB "deliberately chose to effectuate the Placements by directing the transfer of millions of dollars through New York."  *Id.*  He further noted that if the record had demonstrated that Arcapita, and not BisB, selected the U.S. Dollar and chose to use the New York accounts to effectuate the placements, BisB's contacts with the United States would have been adventitious, and that jurisdiction would not have lied.  *Id.*  It is the last statement on which BisB relies in the instant motion.  BisB claims that evidence unearthed in discovery revealed that it was Arcapita who chose to invest in U.S. Dollars, and that this new evidence placed this case squarely within the counterfactual posited by Judge Daniels, thereby upending the premise for Judge Daniels's ruling.

Contrary to BisB's assertions, the evidence showing that Arcapita chose to invest in U.S. Dollars does not upend the premise of the district court's ruling.  While Arcapita may have indicated its desire to invest in U.S. Dollars, BisB chose to accept those terms and then designated correspondent bank accounts in New York to receive the fund transfers.  The fact that Arcapita *wanted* to invest in U.S. Dollars does not render BisB's use of New York correspondent banks adventitious.  *Cf. id.*  As BisB's own witness conceded, BisB was free to accept or reject the proposed terms.  App. 834 (Jarrar Depo Tr.) at 886 (204:23-205:6).  And as Judge Daniels explicitly noted, BisB could have avoided the United States entirely by routing the placements through correspondent accounts anywhere in the world.  549 B.R. at 71; *see also* App. 834 (Jarrar Depo Tr.) at 886–87 (205:7-206:7) (affirming that Arcapita would not have known where to send the funds unless BisB identified the bank).  BisB's new evidence therefore does not bring

this case within Judge Daniels's counterfactual.  I find no clear error and affirm the finding of personal jurisdiction.

B.   The Bankruptcy Court Did Not Abuse Its Discretion in Failing to Abstain Based on International Comity

BisB contends that the Bankruptcy Court improperly focused on Appellee's preference claims as the basis for retaining jurisdiction, failed to factor Appellee's breach of contract claim into the analysis, and wrongly concluded that the U.S., rather than Bahrain, is the proper regulating state.  BisB argues that if the Bankruptcy Court had analyzed the breach of contract claim, which BisB contends was based on conduct in Bahrain, the Bankruptcy Court would (or should) have concluded that abstention was appropriate because the Bahraini government has a stronger interest in regulating such conduct.  Having reviewed the Bankruptcy Court's reasoned analysis, I find no abuse of discretion and therefore affirm its decision, declining to abstain on international comity grounds.

Under international comity, "states normally refrain from prescribing laws that govern activities connected with another state when the exercise of such jurisdiction is unreasonable." *Maxwell Commc'n Corp. ex rel. Homan v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1047–48 (2d Cir. 1996) (quoting Rest. 3d Foreign Relations § 403 (1986)).  Abstention may be based on adjudicatory comity—applicable when there is a parallel judicial proceeding—or prescriptive comity—a discretionary doctrine under which courts limit the extraterritorial reach of U.S. laws through statutory construction.  In the context of transnational insolvencies, prescriptive comity is an appropriate and often invoked doctrine, *see Allstate Life Ins., Co. v. Linter Group Ltd.*, 994 F.2d at 996, 999 (2d Cir. 1993), especially where a U.S. court is confronted with a foreign bankruptcy proceeding.  *See, e.g., Linder Fund, Inc. v. Polly Peck Int'l plc*, 143 B.R. 807, 810 (Bankr. S.D.N.Y. 1992) (dismissing on comity

grounds U.S. action against debtor who was involved in English insolvency proceedings); *see also In re Axona Int'l Credit & Commerce, Ltd.*, 88 B.R. 597 (Bankr. S.D.N.Y. 1988), *aff'd*, 115 B.R. 442 (S.D.N.Y. 1990), *appeal dismissed*, 924 F.2d 31 (2d Cir. 1991).

    International comity comes into play, however, only when there is a true conflict between domestic and foreign law.  A true conflict exists if "compliance with the regulatory laws of both countries would be impossible."  *See In re Picard*, 917 F.3d 85, 102 (2d Cir. 2019) (citing *In re Maxwell*, 93 F.3d at 1050); *accord Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993).  If a true conflict does exist, a court must consider whether abstention is appropriate.  In so doing, courts apply the factors listed in the Restatement Third of Foreign Relations: (a) the link of the activity to the territory of the regulating state; (b) the connections between the regulating state and the person principally responsible for the activity; (c) the character of the activity to be regulated and the importance of regulation to the regulating state; and (d) the likelihood of conflict with the regulation by another state.  § 403; *see also F. Hoffman-La Roche v. Empagran S.A.*, 542 U.S. 155, 165 (2004).  The proponent of comity bears the burden of proving abstention is appropriate.  *See, e.g., Attestor Cap. LLP v. Lehman Bros. Hldgs. Inc. (In re Lehman Bros. Hldgs. Inc.)*, No. 18-cv-7682, 2019 U.S. Dist. LEXIS 139185, at *23–24 (S.D.N.Y. Aug. 16, 2019), *aff'd sub nom. Attestor Ltd. v. Lehman Bros. Hldgs. Inc. (In re Lehman Bros. Hldgs. Inc.)*, 821 F. App'x 66 (2d Cir. 2020), *modified by* 829 F. App'x 567 (2d Cir. 2020) ("'[S]ince comity is an affirmative defense,' its proponent carries 'the burden of proving that comity was appropriate.'") (quoting *Allstate Life Ins. Co.*, 994 F.2d at 999).  I hold that the Bankruptcy Court did not abuse its discretion in declining to abstain on grounds of comity.

BisB argues that the Bankruptcy Court focused its analysis on the Committee's preference claims and failed to factor the Committee's breach of contract claim into its analysis yet granted summary judgment on this claim.  The failure to properly consider the breach of contract claim, BisB argues, lead the Bankruptcy Court to conclude that the U.S. has a stronger regulatory interest.  This argument misconstrues both the facts and the Bankruptcy Court's opinion.  Contrary to BisB's assertion, the conduct at the heart of this action is the wire transfers routed through the New York correspondent banks.  As the Committee correctly notes, those transfers gave rise to *all* of its claims.  Indeed, if the transfers had never been effectuated, the Committee would not have had reason to institute the adversary proceedings against BisB.  The fact that BisB asserted its setoff rights in Bahrain, which the Bankruptcy Court concluded was a breach of the placement agreements, does not render BisB's conduct extraterritorial, nor does it give the Bahraini government a greater regulatory interest.  The record evidence suggests just the contrary.  The CBB's Formal Direction instructed BisB to return the funds or to appeal to the Bankruptcy Court to seek relief from the automatic stay.  If the Bahraini government had an interest in regulating the conduct itself, one might expect that it would only have instructed that BisB return the funds and not mentioned possible avenues for relief in the Bankruptcy Court.

I further find no abuse of discretion because there appears to be no true conflict of law, and therefore, principles of international comity simply are not implicated.  The CBB's Formal Direction instructed BisB to comply with U.S. law—either by returning the funds or seeking relief from the automatic stay.  To be sure, BisB disputes that the CBB's Formal Direction constituted binding Bahraini law, but as I address below, the CBB Formal Direction became the operative law when issued, and therefore, once in effect, eviscerated any conflict that might have existed between the Bahraini Civil Code and the U.S. Bankruptcy laws.  The

Bankruptcy Court did not abuse its discretion by failing to abstain on international comity grounds.  Accordingly, I affirm the judgment of the Comity Order, 575 B.R. 229 (Bankr. S.D.N.Y. 2017).

In addition, although BisB purports to challenge the Bankruptcy Court's subsequent order, dated February 5, 2018, denying BisB's motion to reconsider the Comity Order, BisB has not advanced any arguments as to why the February 5 order was erroneous.  The issue is deemed waived, and I therefore also affirm the denial of reconsideration.  *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) (quoting *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997)) ("Merely mentioning the relevant issue in an opening brief is not enough; '[i]ssues not sufficiently argued are in general deemed waived and will not be considered on appeal.").

C.   The Bankruptcy Court Did Not Err in Concluding that BisB Was Not Entitled to a Right of Setoff Under Either Section 553 or the Safe-Harbor Provisions of the Bankruptcy Code

Section 553 of the Bankruptcy Code does not create a creditor's right of setoff, but merely preserves the right if it otherwise exists under applicable non-bankruptcy law.  *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995).  Section 553 imposes several criteria, not at issue here, that must be met be met to establish a right of setoff.  But even if a right of setoff is technically established, that right is not absolute.  A creditor may be precluded from exercising that right if one of the statutory exceptions to the right of setoff apply, *see* 11 U.S.C. § 553(a)(3), or if the bankruptcy court, having "scrutinize[d] the right of setoff in light of the Bankruptcy Code's goals and objectives[,] . . . [including] equitable treatment of all creditors," believes it necessary to exercise its discretion to "invoke equity to bend the rules, if required to avert injustice."  *In re Bennett Funding Grp.*, 212 B.R. at 212 (citations and quotations omitted).

17

In sum, a creditor must first prove that a right of setoff exists under applicable law; that right must not be subject to the exceptions listed in Section 553(a)(3); and, the Bankruptcy Court must find that principles of equity do not otherwise disfavor allowing the setoff.

A setoff may also be upheld if the transactions fall within one of the so-called safe harbor provisions of the Bankruptcy Code. These provisions protect transactions involving, as relevant here, securities contracts, forward contracts, swap agreements, and other contractual rights under the law merchant or by reason of normal business practice. *See* 11 U.S.C. §§ 362(b), 362(b)(17), 362(o), 555, 556, 560, 561(a).

Before the Bankruptcy Court, BisB argued that it had a right to setoff under Bahraini Law and Shari'a Principles, and that the setoff was protected under the safe-harbor provisions because the *murahabas* were securities contracts, forward contracts, swap agreements, or contractual rights protected under the law merchant or by reason of normal business practice. The Bankruptcy Court disagreed, finding no right to setoff under Bahraini law; that none of the safe harbor provisions apply to the *murabahas*; and, that any setoff was disallowed under Section 353(a)(3)(C) because BisB incurred the debts for the purpose of obtaining a right of setoff. Finding no valid basis for setoff, and that BisB nevertheless retained in possession of property of the estate, the Bankruptcy Court concluded that BisB was in violation of the automatic stay and ordered turnover of the proceeds, with prejudgment interest. Having reviewed the record, the Bankruptcy Court's findings and conclusions, and the instant briefing, I find no error, and for reasons discussed in detail below, affirm the judgment of the Bankruptcy Court.

i.      Rights Under Applicable Law

     a.      Setoff Under Bahraini Law and Shari'a Principles

BisB argues that under Bahraini Law and Shari'a principles that it had a right of setoff at the time it exercised that right. It contends that the CBB Formal Direction could not be applied retroactively to nullify that right, and that the Bankruptcy Court's contrary finding was error.[5]

The Bankruptcy Court did not err in finding that BisB did not have a right of setoff under Bahraini Law or Shari'a principles. Although BisB may have had a right of setoff when asserted on June 28, 2012, that right was abrogated when the CBB issued the Formal Direction on July 4, 2012, instructing BisB to return the funds or seek relief from the Bankruptcy Court. The "applicable law" under Section 553 was established in the Formal Direction because, as the Bankruptcy Court noted, special laws applicable in specific circumstances supersede the general law set forth in the Bahraini Civil Code. Thus, the Bankruptcy Court properly considered whether the right existed, or continued to exist, at the time (and after) the CBB issued the Formal Direction. Moreover, the Formal Direction plainly indicates that BisB did not have a right to setoff. Therefore, the Bankruptcy Court did not err in so finding.

BisB's efforts to contest the retroactive application of the Formal Direction are unpersuasive. To begin, one need not view the application as retroactive. Assuming the setoff itself was valid when exercised, the CBB Formal Direction can simply be viewed as making

---

[5] The Bankruptcy Court considered, in the alternative, whether BisB was presenting an equitable argument in favor of setoff, and if so, whether to exercise its discretion to invoke equity to bend the rules to allow the setoff. *See* 628 B.R. at 444. The Bankruptcy Court declined to do so, finding that BisB had advance knowledge of the CBB's intention to issue the Formal Direction and was able to inform the CBB as to its legal position before the Formal Direction were issued, and also that BisB was able to, and did, request that the CBB withdraw the Formal Direction after it were issued. *See id.* BisB does not specifically challenge the Bankruptcy Court's decision not to exercise its discretion to invoke equity and allow setoff.

unlawful BisB's continued retention of the proceeds.  But even if the CBB Formal Direction were deemed a retroactive application, BisB cites no authority for its contention that CBB Formal Directions cannot supersede existing law and make previously lawful conduct unlawful once issued.  Instead, BisB points to the report of its Bahraini Law expert, which stated, again without relevant citation to any provision of Bahraini law, that the CBB Formal Direction would not rescind or invalidate a previously exercised setoff right.  *See* App. 1494 at 1517–18.  In contrast, the Committee's expert noted that BisB's expert's opinion contradicted the texts of Article 38(c) of the CBB Law and Rule UG-1.1.7, EN-3.1.1 and EN-3.1.2 of Volume 2 of the CBB Rulebook, all of which were cited in BisB's expert's report.  The Committee contends that the texts confirm the binding nature of Formal Direction issued by the CBB.  In addition, the Committee notes that BisB's arguments stand in contradiction to BisB's own conduct after the CBB issued the Formal Direction.  BisB spent three weeks attempting to have the CBB retract the Formal Direction, to no avail.  If BisB is correct that the CBB's Formal Direction could not be applied retroactively to invalidate the set-off right previously exercised, then it would have had no reason to challenge the Formal Direction at all.  And as an additional matter, the CBB would have had no reason to issue the Formal Direction, if in fact, it could not apply retroactively.

However, the question of whether enforcing the CBB's Formal Direction amounts to a retroactive application is ultimately moot based on both Bahraini statutory law and judicial interpretation.  Both parties' experts agree that the Bahraini Civil Code is a form of general law whose provisions do not supersede any special law dealing with a specific issue.  *See* 628 B.R. at 439.  To wit, the Bahraini Civil Code states that "[t]he provisions of the attached code shall not prejudice the provisions set forth in any special legislation."  *Id.*  In addition, the Court of

Cassation in Bahrain also has recognized that special laws take precedence over the general law:
"It is established that the existence of a special law stops resorting to the provisions of a general
law except for matters not covered by a special law.  A special law cannot be undermined by a
general law as such undermining contradicts the purpose for which the special law was enacted."
*Id.*  I find no error in the Bankruptcy Court's conclusion that the CBB Formal Direction
constituted controlling and applicable law, and that the setoff was not valid thereunder.

      In addition, I note the tension between BisB's argument here and its argument as
to the Bankruptcy Court's purported error in declining to abstain on grounds of international
comity.  As to international comity, BisB argues that the Bankruptcy Court should have declined
to exercise jurisdiction because the Bahraini government (and by implication the CBB as its
primary regulator) had a greater interest in regulating BisB's conduct.  Here, in contrast, BisB
argues that the Bankruptcy Court erred in giving full effect to the CBB's Formal Direction as an
expression of Bahraini law.  BisB cannot have it both ways—that is, the Bankruptcy Court could
not both be required to defer to the regulatory authority of the Bahraini government but also,
while retaining jurisdiction, to flout the Bahraini government's authority.  The Bankruptcy Court
did not err in refusing to abstain on international comity grounds, and in exercising its
jurisdiction, it rightly afforded deference to the Bahraini government by enforcing the laws
enacted, including the CBB's Formal Direction, instructing BisB to return the proceeds or seek
relief in the Bankruptcy Court.  *See* 628 B.R. at 444–45 (citing *Hilton v. Guyot*, 159 U.S. 113,
163–64 (1895)) (rejecting BisB's "invitation" for the Bankruptcy Court "to second guess the
wisdom of the CBB's actions as unwise or poor policy).

      I find no clear error in the Bankruptcy Court's ruling that the setoff was not valid
under Bahraini Law, nor do I find any abuse of discretion in its refusal to allow setoff as a matter

of equity, and therefore, affirm the factual findings and conclusion.

        b.      Setoff as Performance of a Contract Under Bahraini Law

        BisB contends that the Bankruptcy Court erred in declining to consider its argument that setoff constituted performance of contract under Bahraini law.  This argument is without merit because BisB relies on the general law, which the Bankruptcy Court found was superseded by the special law embodied in the CBB's Formal Direction.  Thus, even assuming that the Bahraini Civil Code permitted setoff as performance of a contract, the lawfulness of BisB's conduct was to be adjudged according to the special law (the Formal Direction) enacted to cover the specific issue (BisB's refusal to turn over the proceeds).  In short, the Bankruptcy Court could not err in failing to consider whether BisB's conduct was lawful under a nongoverning general statutory provision.  Rather, the Bankruptcy Court properly considered whether BisB's conduct was lawful under the CBB's Formal Direction—the special law expressly applicable to the present circumstances.

        ii.      Setoff Protected by the Safe Harbor Provisions

        In addition to the right of setoff preserved under Section 553, the Bankruptcy Code includes a number of "safe harbor" provisions that also protect transactions from challenge. The safe harbors were designed to "minimi[ze] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries . . . .  If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (citations and quotations omitted).  As relevant here, the safe harbor provisions apply to securities contracts, forward contracts, swap

agreements, and other contractual rights.  *See* 11 U.S.C. §§ 362(b)(6), 362(b)(17), 362(o), 555, 556, 560, 561(a).

        a.      Securities Under Sections 362(b)(6), 556, and 561(a) of the Bankruptcy Code

BisB contends that the Bankruptcy Court erred in finding that the setoff was not protected as a securities contract.  BisB argues that the *murahaba* agreements are securities within the meaning of Section 101(49)(A), which lists various types of debt instruments as examples of "securities" and "clearly encompasses both equity *and* debt instruments."  A.B. at 79.  BisB also argues that the *murabahas* fall within the residual clause of Section 101(49), which defines a security as including "any claim or interest commonly known as a security." 11 U.S.C. § 101(49)(A)(xiv).

The Bankruptcy Court rejected both of these arguments.  It found that the agreements were not "securities" within the principal definition because they did not bear the "hallmark characteristics" of securities and lacked equity-like features.  The Bankruptcy Court looked to the Second Circuit's decision in *In re Lehman Brothers Holdings Inc.*, 855 F.3d 459, 474–75 (2d Cir. 2017), for guidance.  *See* 628 B.R. at 463–64.  It found that the *murabaha* agreements did not bear the "hallmark characteristics" of securities because neither party bore the same risk and benefit expectations as shareholders, and the only risk assumed was that of nonpayment by the counterparty.  *See id.* at 464–65.  Instead, the Bankruptcy Court found that the agreements were loan-like, based on the parties' own descriptions of the transactions, *see id.* at 462, and based on the fact that the parties agreed on the rate of return and structured the transaction to avoid risk—a point on which which BisB's expert agreed.  In essence, the *murabahas* were not contracts for investment in an agreed-upon commodity; rather, the commodity was a convenient vehicle for effectuating a loan and providing for an interest-like

return without calling it such.  The Bankruptcy Court also distinguished the *murabahas* from other debt securities because the agreements were not publicly tradeable as deployed (and were not traded at all), nor were they fungible, listed on an exchange, or liquid.  *See id.* at 462–63. The Bankruptcy Court further noted that the *murabahas* do not resemble securities because neither party obtained any typical shareholder rights—*i.e.*, voting rights or dividends.  *See id.* at 464.  Rather, the Bankruptcy Court found that it was "particularly easy" to conclude that the *murabahas* at issue were not securities because they essentially were commodity a credit financing arrangement between two parties, and not a liquid, fungible, tradeable instrument.  *Id.* at 463.

BisB disagrees with the Bankruptcy Court's analysis and argues that the *murabaha* contracts replicated the effect of certain securities because they involved the purchasing of commodities, and the purchaser of the commodities bore risks associated with the purchase and disposal of said commodities.  This argument fails because the *murabaha* agreements here had nothing to do with the underlying commodities themselves, and everything to do with structuring a loan-like or credit-financing agreement, structured so as not to run afoul of Shari'a law's outlawing of interest.

BisB also argues that the Bankruptcy Court erred in finding that the *murabahas* did not fall with the residual clause of the definition of securities contracts, which encompasses both equity and debt instruments.  BisB points to the testimony of the Committee's own expert, who stated that the market treats *murabaha* investments as deposit-like instruments.  *See* A.B. at 79–80.  BisB further notes that the Bankruptcy Code's definition of "security" expressly includes a "certificate of deposit" or "note."  *Id.* at 80 n.37 (quoting 11 U.S.C. 101(49)(A)).  It concedes that the Bankruptcy Code does not define either a "certificate of deposit" or a "note" but states

these terms are defined in the United States Uniform Commercial Code. BisB curiously seems to suggest that federal Bankruptcy Law should be construed according to U.S. commercial law; however, this plainly is at odds with its contention (and a point on which all parties seem to agree) that the contracts should be construed according to Bahraini law. Indeed, BisB advanced that argument before the Bankruptcy Court, claiming that the agreements are considered securities in the Bahraini and Islamic funding markets, and should therefore be treated as such under the residual clause. The Bankruptcy Court rejected this argument, noting that the Committee's expert testified that traders in the Islamic funding market treat the agreements as loan-like, which was consistent with the parties' characterizations and the language of the agreements themselves. The Bankruptcy Court further noted the problems that would be created by adopting BisB's argument and construing the U.S. Bankruptcy Code according to the views of a foreign country—namely, that it would promote inconsistency in interpretation of the residual clause and stretch the definition beyond recognition. *See* 628 B.R. at 467.

I find no error in the Bankruptcy Court's analysis and deferral to the parties' own characterizations of the transactions as loan-like. This is wholly consistent with BisB's contention that commodity *murabahas* are liquidity management tools, designed to allow the equivalent of interest to be paid on loans, rather than investments. In addition, and as the Bankruptcy Court noted, the *murabahas*, by their own terms, do not qualify as securities because Section 101(49)(B)(vii) specifically excludes a "debt or evidence of indebtedness for goods sold and delivered or services rendered." *See* 628 B.R. at 464 n.52. The *murabaha* transactions fall within this exclusion for debts, for they provide for the purchase, and repurchase, of the same commodities, plus an increase. Accordingly, the findings and judgment of the Bankruptcy Court are affirmed.

       b.      Forward Contracts Under Sections 362(b)(6), 556, and 561(a) of the Bankruptcy Code or Swap Agreements Under Sections 362(b)(6), 560, and 561(a) of the Bankruptcy Code

BisB also contends that the Bankruptcy Court erred in finding that the *murabahas* were not forward contracts or swap agreements.  Section 101(25)(A) of the Bankruptcy Code defines a forward contract as "a contract . . . for the purchase, sale, or transfer of a commodity . . . with a maturity date more than two days after the date the contract is entered into . . . ."  Section 101(53B)(A)(i)(VII) defines "swap agreements" to include "commodity forward agreements."[6]

Applying the four-factor test originally set out by *In re National Gas Distributors, LLC*, 556 F.3d 247 (4th Cir. 2009), the Bankruptcy Court concluded that the *murabahas* were neither forward contracts nor swap agreements.  Under *Natural Gas*, a contract is considered a forward contract where: (1) substantially all expected costs of performance are attributable to the underlying commodity; (2) the contract has a maturity date of more than two days after the contract was entered into; (3) the price, quantity, and time elements must be fixed at the time of contracting; and (4) the contract has a relationship to the financial markets.  *See id.* at 256–57.  The Bankruptcy Court found that the *murabaha* agreements did not satisfy the second or fourth factors and thus held that the agreements did not qualify as forward contracts or as swap agreements, defined to include commodity forward agreements.

As to the second factor, the Bankruptcy Court noted that the *murabahas* did not have a delivery date of more than two days after the contract was entered into.  *See* 628 B.R. at 469.  The Bankruptcy Court reasoned that the 2003 Investment Agreement, and the investment

---

[6] Before the Bankruptcy Court, BisB also argued that the *murabahas* were "swap agreements" within the meaning of the residual clause under Section 101(53B)(A)(ii).  BisB does not mention the catch-all definition in its opening brief.  The issue is deemed waived.  *See Gross*, 585 F.3d at 95 (quoting *Frank*, 78 F.3d at 833).

transactions on March 8 and 9, 2012, provided for "immediate delivery" of the commodities on "deferred payment terms."  *Id.* at 470.  Because courts link the maturity date to the contract delivery date, *see, e.g.*, *Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of Am.)*, 460 B.R. 360, 373 (Bankr. S.D.N.Y. 2011), the Bankruptcy Court concluded that the *murabaha* contracts at issue had maturity dates that were not more than two days later than the dates on which the parties entered the transactions.  *See* 628 B.R. at 470.

As to the fourth factor, the Bankruptcy Court found that the *murabahas* lacked a relationship to the financial markets because the primary purpose of the agreements was not financial or risk-shifting in nature.  *See* 628 B.R. at 468.  Whereas ordinary commodity contracts have the primary purpose of arranging for the purchase and sale of the underlying commodity, a forward contract aims to protect and hedge against fluctuations in the price of a commodity.  For the same reasons discussed in connection with BisB's arguments in favor of treating the *murabaha* as securities, the Bankruptcy Court found that the primary purpose of the agreements at issue was not risk-shifting in nature because they provided for immediate delivery and did not expose either party to the risk of price fluctuations.  *See id.* at 469.

Again, I find no clear error in the Bankruptcy Court's analysis.  The *murabaha* agreements were not akin to forward contracts.  The purchase of the underlying commodity was a vehicle to provide a rate of return on a loan, agreed upon in advance.  Nothing in the record indicates that the *murabahas* involved speculation on the price of the underlying commodities, which might have brought the transactions within the safe harbor provisions.  I agree with the Bankruptcy Court that the *murabaha* agreements do not satisfy the second or fourth factors of the *National Gas* test, and therefore, are not forward contracts within the meaning of Section 101(25)(A) of the Bankruptcy Code.

BisB also argues that the Bankruptcy Court erred in treating the transactions as ordinary commodities contracts when the parties' experts agreed that commodity *murabahas* are used for liquidity management and not for the purchase of commodities.  *See* A.B. 84, 84 n.41. BisB misreads the Bankruptcy Court's analysis.  The Bankruptcy Court analogized the agreements to ordinary commodity contracts to underscore that the purpose was not to hedge against price fluctuations in the market but rather to use the commodity as a vehicle for transferring the funds in a manner that was compliant with Shari'a investment principles and also allowed for a return, without expressly charging interest.  The Bankruptcy Court's conclusion that the *murabahas* are not risk-shifting in nature is further supported by the fact that the parties agreed on the rate of return at the outset.  The only risk was that of default or nonpayment by the counterparty, but that risk had no connection whatever to changes in the price of the commodity because neither party retained the commodities for any prolonged period of time.  And this finding is fully consistent with BisB's contention that the *murabaha* agreements were not ordinary commodity contracts, and instead, vehicles for liquidity management.

BisB also argues that the Bankruptcy Court in failing to adopt the universal usage for what "maturity date" means—purportedly, the deferred payment date at the end of the contract, and not as the Bankruptcy found, the contracts' initial execution date.  BisB argues that this reflects "the common-sense notion of how *murabahas* work financially" because although the parties agree to a fixed return at the outset, "the final result of who 'won' or 'lost' the terms of the contract – *i.e.*, who made the right guess about whether the fixed return is a good price – is not determinable until the end of the contract period . . . ."  A.B. at 85.

Again, I find no error in the Bankruptcy Court's analysis here.  BisB's argument is based on the assumption that the parties entered into the *murabaha* agreements to speculate on

the price of the underlying commodity.  Not only does this misconstrue nature of the agreements,

but it also stands at odd with BisB's other argument—that the purpose was not to acquire the

commodities.  *See, e.g.*, *id.* at 83–84 (arguing that interbank *murabahas* are used for short-term

liquidity management . . . *not* for investment in commodities) (emphases in original); *id.* at 84

(emphasizing that the committee conceded that the *murabahas* did not involve physical delivery

of the commodities purchased, and that the parties' experts agree that *murabahas* are used for

cash management, not commodities purchases).  If that were, in fact, the purpose, one would

expect that at least one party would retain control of the commodity, but as the record here

shows, neither party did.  BisB immediately delivered the commodities to Arcapita, and Arcapita

was obligated to pay BisB on the deferred payment date, the price of the commodities plus the

fixed rate of return.  Thus, BisB's efforts to characterize the agreements in terms of wins and

losses are unavailing.  The parties were not making guesses about whether the fixed return was a

good price.  Arcapita accepted the fixed return and agreed to pay it on a deferred basis.  The

"guess" that BisB presumably made was that Arcapita would pay up on the specified deferred

date, and assuming that it guessed correctly, BisB knew precisely the amount that it would

receive, regardless of any price fluctuations or other interim changes the underlying commodity

market.  I agree with the Bankruptcy Court that the *murabahas* were not protected as forward

contracts or swap agreements under the safe harbor provisions.

   As an additional matter, I would note that allowing BisB to take advantage of the

safe harbor provisions would be inconsistent with the statutory purpose.  The Second Circuit has

explained in the context of swap agreements, for example, that Section 560 "shields swap

participants from some of the risks associated with a counterparty's bankruptcy and enables them

to unwind the transactions."  *See Lehman Bros. Special Fin. Inc. v. Branch Banking & Trust Co.*

*(In re Lehman Bros. Holdings Inc.)*, 970 F.3d 91, 102 (2d Cir. 2020).  Here, BisB does not seek to unwind any transaction.  BisB seeks to retain funds to which it purports to be entitled.  It is the Committee who effectively seeks to unwind the transaction.  Thus, even assuming that the transactions at issue were swap agreements, for example, BisB cannot claim protection under the safe harbor provision in Section 560 because it does not claim, nor seek to enforce, a right to liquidation.  BisB's claim to relief under Section 556, which allows the liquidation, termination and acceleration of certain securities and forwards contracts is likewise misplaced because here again, BisB does not seek to liquidate or accelerate any contract.  Rather, it seeks to enforce pre-Petition transactions and to retain the proceeds.  The safe harbor provisions are inapplicable not only because the *murabahas* are neither forward contracts nor swap agreements, but also because BisB does not seek protection under those provisions in a manner that is consistent with the statutory purpose.  Accordingly, I affirm the finding and judgment of the Bankruptcy Court.

> c.  "Law Merchant" or "Normal Business Practice" Under Sections 362(b)(6), 362(b)(17), 362(o), 555, 556, 560, and 561 of the Bankruptcy Code

BisB cites as error the Bankruptcy Court's finding that its purported setoffs were not contractual rights protected under the safe harbors under the law merchant or by reason of normal business practice.  BisB does not argue this point separately but makes passing reference to "the law merchant" and "normal business practice" in connection with its argument for why the Bankruptcy Court erred in applying the CBB's Formal Direction retroactively.  Because BisB offers no arguments as to why the contracts *should* be protected as part of "the law merchant" or "normal business practice," the issue is deemed waived, and the judgment of the Bankruptcy Court is affirmed.  *See Gross*, 585 F.3d at 95 (quoting *Frank*, 78 F.3d at 833).

iii.    Setoff Disallowed Under Section 553(a)(3)(C) – Debts Obtained for the
Purpose of Obtaining a Right of Setoff

BisB contends that the Bankruptcy Court erred in finding that the *murabaha* debts

were obtained "for the purpose of obtaining a right of setoff" and invalid under Section 553.

However, as the Bankruptcy Court found and I affirmed, BisB did not have a right to setoff

under Bahraini law, and the transactions were not protected under the safe harbor provisions of

the Bankruptcy law.  The question of whether a setoff is disallowed under Section 553(a)(3)(C)

only arises once a right of setoff is established, and here there is none.  Nevertheless, in the

interest of completeness, I address BisB's arguments below.

"The doctrine of setoff has long occupied a favored position in our history of

jurisprudence."  *Bohack Corp. v. Borden Inc.*, 599 F.2d 1160, 1164 (2d Cir. 1979) (construing

§ 68 of the previous Bankruptcy Act, which is now embodied in Section 553).  Although setoff

can have the effect of paying one creditor more than another, in derogation of the general policy

of the Bankruptcy Code to afford equal treatment to creditors, setoffs are accepted and approved

because they are based on long-recognized rights of mutuality.  *See id.* at 1165.  However,

Section 553 protects against an undue preference, by prohibiting debts incurred for the purpose

of obtaining a right of setoff.  *See* 11 U.S.C. § 553(a)(3)(C).  The Eleventh Circuit has provided

this guidance:

> Although the conduct may occur in many forms, the archetypal situation is the
> case where a debtor has a preexisting obligation to the creditor, and, in the months
> prior to debtor's filing for bankruptcy, the debtor pays back the creditor by
> "loaning" him money. Later the parties notice the two debts and engage in setoff,
> canceling both of them. In this archetypal situation, the creditor obtains the debt
> only to engage in setoff, thus this "loan" is disfavored by the setoff rules.

*In re Dillard Ford, Inc.*, 940 F.2d 1507, 1513 (11th Cir. 1991).  Generally, courts examine

whether the debts were incurred in good faith and in the ordinary course of business.  *See Clean*

*Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 492 B.R. 445, 467
(Bankr. M.D. N.C. 2013); *see also In re Automatic Voting Mach. Corp.*, 26 B.R. 970, 973
(Bankr. W.D.N.Y. 1983) (holding that debt was not incurred for purpose of obtaining setoff
where deposit was made in the ordinary course of the debtor's business and made in an
unrestricted checking account maintained for the operation of the debtor's business).  A
creditor's awareness of the debtor's financial difficulties may also contribute to the conclusion
that a creditor incurred the debt for the purpose of setoff.  *See Union Cartage Co. v. Dollar
Savings & Trust Co. (In re Union Cartage Co.)*, 38 B.R. 134, 138–40 (Bankr. N.D. Ohio 1984).

   The Bankruptcy Court found that BisB obtained the pre-Petition debt for the
purpose of obtaining a setoff.  In so finding, it considered all the relevant circumstances of the
transaction.  First, the Bankruptcy Court found that the transactions were outside the regular
course of business of the parties, noting that Arcapita made no placements in 2012 and only one
in March 2011, which was then rolled over several times.  *See* 628 B.R. at 447.  It also noted the
questionable timing of Arcapita's placements—that the placements occurred on March 13 and
15, 2012, just days prior to the Petition Date on March 19, 2011, and at a time when BisB was
generally aware that Arcapita was in financial difficulty, and reluctant to extend any more credit
in light of Arcapita's inability to pay.  *See id.* at 447–48.  The Bankruptcy Court also remarked
on the curious amount of the placements.  Although the placements totaled $30 million, BisB
retained only the March 14, 2012 Placement of $10 million, which was conveniently just over
the $9.8 million owing.  *See id.* at 447.  Further, the Bankruptcy Court noted that it was even
unusual for the parties to maintain placements of this magnitude—totaling $30 million—with
one another at any one time.  *See id.*  This was evidence of the archetypal situation, described by
the Eleventh Circuit, in which a debtor builds up debt to afford a later setoff.

In addition, the Bankruptcy Court pointed to conversations between Arcapita and BisB, before and after the Petition Date, as well as the day of.  *See id.* at 448–51.  These conversations revealed that BisB was aware of Arcapita's financial difficulties, and that BisB was concerned with recovering the monies owed it.  The Bankruptcy Court found that the discussions appeared to choreograph BisB's ultimate withholding of the funds at issue, notwithstanding the fact that Arcapita advised BisB that the estate was frozen, and BisB clearly understood the effect of the stay.  Based on the direct and circumstantial evidence of collusive conduct, that had the coincidental and convenient effect of making BisB whole, the Bankruptcy Court concluded that BisB obtained the pre-Petition debt for the purpose of obtaining a setoff, thereby invalidating any right that might have existed.  *See id.* at 457.

BisB argues that the Bankruptcy Court's finding that BisB purposely received Arcapita's pre-Petition investments to obtain setoff rights is "contradicted by the extensive evidence in the record."  First, BisB argues that Arcapita initiated the pre-Petition placements without stating the purpose.  Second, it claims that it did not link any pre-Petition investment with securing setoff rights, let alone to secure preferential treatment in Arcapita's bankruptcy case, of which it had no expectation would be filed.  Finally, it points to post-Petition conversations, which BisB claims were aimed at resolving the dispute, but which resulted in mutual demands after the discussions broke down—with Arcapita demanding repayment and BisB asserting setoff.  Accordingly, BisB argues that it only began considering its setoff options after Arcapita's bankruptcy filing.  BisB argues that the Bankruptcy Court's finding, that BisB sought to build up a debt pre-Petition to preserve a later right to setoff, was clear error.

Having reviewed the record and the Bankruptcy Court's factual findings, I find no clear error.  Contrary to BisB's assertions, the Bankruptcy Court did not rely solely on post-

Petition conversations.  In fact, the Bankruptcy Court discussed, at length, the unusual nature of the transactions at the time they were entered into, including BisB's curious demand for an investment over $10 million—just enough to cover Arcapita's debt.  Although Arcapita requested the placements, it did so in an effort to entice BisB to roll over the BisB placements coming due on March 15 and 16, 2012.  In addition, it was BisB that demanded an amount over $10 million, again just over the amount Arcapita allegedly owed.  Finally, as to BisB's argument that it only entertained a setoff after discussions broke down, the Bankruptcy Court properly considered these facts as part of the continuum of conduct and under the totality of circumstances.

Moreover, as the Creditors' Committee points out, the timing for BisB's exercise of its setoff rights was particularly curious.  Although the March 14 Placement's maturity date was March 29, 2012, BisB did not exercise a right of setoff until three months later, on June 28, 2012, and only days before the CBB issued its Formal Direction.  This tends to undermine BisB's argument that it was unaware that setoff was not lawful, or that the CBB intended to provide otherwise.  Rather, BisB's conduct suggests that it intended to preempt the CBB's Formal Direction and thereby preserve a right to setoff.

The evidence, taken as a whole, supports the finding that BisB entered into the transaction to gain a setoff.  Because I am not left with the "firm conviction that a mistake has been committed," I affirm.  *See In re Bennett Funding Grp.*, 212 B.R. at 211.

D.     The Bankruptcy Court Did Not Err in Ruling that BisB's Exercise of Setoff Violated the Automatic Stay Provisions of Sections 362(a)(3) and 362(a)(7) of the Bankruptcy Code.

BisB cites as error the Bankruptcy Court's ruling that BisB's exercise of its setoff rights under Bahraini Law and Shari'a principles violated the automatic stay provisions of

Section 362(a)(3) and 362(a)(7).  However, it fails to advance any specific arguments as to why the Bankruptcy Court's findings were erroneous.  Rather, the purported error appears to be based on other purported errors—namely, that the Bankruptcy Court erred in finding that BisB's exercise of right to setoff was not protected under the various safe harbor provisions.  A.B. at 90–91 (arguing that BisB's setoff rights were contractual rights that fall within the safe harbor provisions, and were therefore, rights that BisB could exercise "*regardless* of the Bankruptcy Code's automatic stay . . . and *outside* of the bankruptcy process (instead of getting . . . permission that would otherwise be required under Section 553 . . . ") (emphasis in original).  As discussed above, the Bankruptcy Court did not commit error in finding that none of the asserted safe harbor provisions applied.  Thus, BisB was not entitled to retain the funds, and therefore, in so doing, BisB violated the automatic stay.  The findings and judgment of the Bankruptcy Court are affirmed.

> E.   The Bankruptcy Court Did Not Abuse its Discretion in Ruling that Prejudgment Interest Should Accrue on Amounts Owed to The Committee

BisB argues that the Bankruptcy Court erred in awarding prejudgment interest because the payment of interest violates Islamic Shari'a law.  The award of prejudgment interest is a matter confided to the court's broad discretion.  *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071–72 (2d Cir. 1995).  Ordinarily, a request for such interest should be granted, absent a sound reason to deny it.  *Savage & Assocs. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008).  When determining whether to award prejudgment interest, courts in this Circuit look to the source of law underlying the plaintiff's claims.  *See Kittay v. Korff (In re Palermo)*, 739 F.3d 99, 107 (2d Cir. 2014).  In a contract action, where the governing law is established through a choice of law provision, the substantive law of the chosen jurisdiction controls the award of prejudgment interest.  *See PNCEF, LLC v.*

*Omni Watch & Clock Co.*, No. 09-CV-0975, 2010 U.S. Dist. LEXIS 102910, at *19 (E.D.N.Y. Sept. 24, 2010) (citing *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 614 (2d Cir. 1996)). In determining whether to award prejudgment interest, courts consider "(i) the need to fully compensate the wronged party for actual damages suffered; (ii) considerations of fairness and the relative equities of the award; (iii) the remedial purpose of the statute involved; and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992). Prejudgment interest is not a penalty, but rather is viewed as delayed damages to be awarded as a component of compensation to the prevailing party. *See General Motors Corp. v Devex Corp.*, 461 U.S. 648, 654 n.10 (1983); *see also West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).

The Bankruptcy Court did not abuse its discretion in awarding prejudgment interest. The Bankruptcy Court granted summary judgment to the Committee on its claim for breach of contract under Bahraini law and for turnover under Section 542(b) of the Bankruptcy Code. Because the Committee's claim for breach of contract was governed by Bahraini law, the Bankruptcy Court looked to Bahraini law for guidance. *See* Prejudgment Interest Decision, 633 B.R. 207, 211 (S.D.N.Y. 2021). Although Shari'a, and therefore Bahraini, law forbids payment of interest, the Bankruptcy Court found that a prejudgment interest award was consistent with other provisions of the Bahraini Civil Code governing the remedies for breach of contract and also consistent with the compensatory purpose of prejudgment interest under American law. The Bankruptcy Court cited the following provisions in the Bahraini Civil Code. First, Article 223 allows a party to recover, as a component of damages, "losses suffered by the creditor and profits of which he has been deprived" upon the breach of contract. *Id.* Next, 140(a) of the Bahraini

Civil Code provides that "[i]n bilateral binding contracts if one of the parties does not perform his obligation, the other party may . . . demand from the judge the performance . . . of the contract, with damages[.]" *Id.* Finally, Article 188 provides that a party that has received "that which is not due to him" in bad faith must "restitute in addition the interest and profit that he has gained or that he has failed to gain by neglect on the thing unduly received[.]" *Id.* Declining to elevate form over substance, the Bankruptcy Court found that awarding prejudgment interest was not inconsistent with or forbidden by Bahraini law because the above-cited provisions have a compensatory purpose.

       Finding that prejudgment interest was consistent with Bahraini law, the Bankruptcy Court next considered whether an award was warranted. It noted that BisB had wrongfully withheld (and continued to do so) the monies owed for close to a decade, despite the CBB's clear directive instructing BisB to return the funds or seek the approval of the Bankruptcy Court. As a result, Arcapita's estate was deprived of the use of those funds, both for distributions to creditors and equity holders as well as for the administration of the bankruptcy case. *See id.* at 212 (noting that Appellee was forced to borrow funds to administer the cases under a debtor-in-possession financing facility). Based on these circumstances, the Bankruptcy Court found prejudgment interest appropriate. *See id.*

       I find no error in the Bankruptcy Court's interpretation of the plain statutory text of the Bahraini Civil Code nor its discretionary decision to award prejudgment interest in light of the circumstances. While Shari'a law may forbid interest, as a general matter, and in the conventional sense, the Bahraini Civil Code expressly provides for a full recovery of damages, including "interest and profit." Here, prejudgment interest serves a proxy for the "profits of which [the Committee] has been deprived[.]" Bahraini law plainly and expressly provides for

full compensation for breaches of contract as well as restitution for ill-gotten gains.  BisB wrongfully withheld funds owed to Arcapita's estate and benefitted from retaining them.  The prejudgment interest award thus transferred back to the estate "the interest and profit . . . unduly received."  Given the sound reasons underlying the Bankruptcy Court's decision, I can find no abuse of discretion in its decision to follow the general rule that prejudgment interest should be awarded except when there is sound reason to deny it.  Accordingly, the decision awarding prejudgment interest, 633 B.R. 207, is affirmed.

> F.    The Bankruptcy Court Did Not Abuse Its Discretion in Setting the Prejudgment
>       Interest Rate at New York's Statutory Prejudgment Interest Rate of 9% Per
>       Annum.

BisB argues that even assuming that prejudgment interest was permissible, the Bankruptcy Court erred in setting the rate according to New York's statutory rate, rather than using the federal treasury rate under 28 U.S.C. § 1961(a), which BisB calculated at 0.738% for the applicable period of time.

As is true with respect to a court's decision to award prejudgment interest, its decision as to the appropriate prejudgment interest rate also is a matter committed to the sound discretion of the court.  *See Endico Potatoes*, 67 F.3d at 1071–72.  In breaches of contract claims, courts ordinarily look to the underlying state law for the appropriate rate.  *See Adrian v. Town of Yorktown*, 620 F.3d 104, 107 (2d Cir. 2010).  Although turnover claims arise out of federal law, the claims are based on property rights governed by state law, and so courts also look to the relevant state law when calculating prejudgment interest on turnover claims.  *See Tapmasters Hoboken, LLC v. Blackrock Millwork Co., LLC (In re Tapmasters Chelsea, LLC)*, 621 B.R. 580, 584 (Bankr. S.D.N.Y. 2020). The appropriate prejudgment interest rate depends on the circumstances of an individual case, and courts in this Circuit are free to consider several

alternative means of calculating the measure of damages (or to estimate the right percent to return the right amount of damages).

   In determining what interest rate should apply, the Bankruptcy Court looked to applicable Bahraini law, notwithstanding the prohibition on interest generally, and the concept of compensation incorporated thereunder.  *See* Interest Order at 214.  The Bankruptcy Court considered the specific facts of the case and the lost profit opportunities to the Arcapita estate and costs suffered as a result of being deprived of the funds.  *See id.*  The Bankruptcy Court also considered three interest rates identified by the Committee—the rate of return available in the Bahraini investment market over the decade during which BisB had withheld the funds (approximately 8.08%); the cost of debtor-in-possession financing (not less than 12%); and, the rate of return that could have been achieved if the funds had been invested elsewhere (11.072 – 13.13% in the U.S stock market).  Finally, the Bankruptcy Court noted the importance of the suit's connections to New York, citing to Judge Daniel's observation that BisB deliberately chose to utilize New York correspondent back accounts, and more generally, New York's and the United States's banking system.  *See id.* (citing 549 B.R. at 70).  Although the Bankruptcy Court ultimately set the prejudgment interest rate at 9%, the New York statutory rate, the Bankruptcy Court stated that its decision was based on the unique factors in the case, including the rate of return available in the Bahraini investment market, the cost of debtor-in-possession financing, and the rate of return generally available during the time, as well as the suits connections to New York.  *See id.* at 213–14.  It rejected BisB's argument in favor of the federal statutory rate because the 0.783% rate calculated and proposed by BisB would "severely undercompensate the estate."  *Id.* at 213.

The Bankruptcy Court did not abuse its discretion in awarding prejudgment interest at the New York statutory rate of 9%. It made "specific findings regarding the matter" and articulated the reasons for its decision. *Cf. Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 138, 140 (2d Cir. 2000) (finding abuse of discretion where district court gave no reasons for applying the § 1961 rate and made no findings as to why the § 1961 rate would adequately compensate the prevailing party). The Bankruptcy Court considered what amount of compensation was necessary, looking to the losses in profits and costs incurred. It attempted to set a rate that would approximate that amount that would compensate the estate, consistent with the provisions under the U.S. Bankruptcy Code and Bahraini law. The Bankruptcy Court's finding that BisB's proposed rate would severely undercompensate the estate also is amply supported. Because the Bankruptcy Court made specific findings and provided cogent and well-founded reasons for its decision, I find no abuse of discretion and affirm the judgment.

## CONCLUSION

For reasons provided above, the challenged orders of the Bankruptcy Court are affirmed, and the appeal dismissed. Oral argument scheduled for June 7, 2022 is canceled. The Clerk of Court shall enter judgment in favor of the Committee and close the case.

SO ORDERED.

Dated:   May 23, 2022                                   /s/ Alvin K. Hellerstein
         New York, New York                     ALVIN K. HELLERSTEIN
                                                United States District Judge